The Honorable the judges of the United States Court of Appeal for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the court is now sitting. God save the United States and this Honorable Court. Good morning welcome to the Fourth Circuit. Please have a seat. Before we get started, Rachel, can you come up for just a second? All right our first case is Cosby v. South Carolina Probation, Parole. Ms. Atkinson, we'll be glad to hear from you. Yes, good morning Your Honors. May it please the court, I'm Courtney Atkinson and I'm counsel for the appellant in this matter Kristen Cosby. We are here this morning on Ms. Cosby's appeal of the district court's grant of summary judgment to her former employer in regard to Ms. Cosby's claims for discrimination and retaliation in violation of Title VII. We contend that grant of summary judgment was error in this case and that the district court failed to properly consider all evidence that was put before the district court on both Ms. Cosby's claims for discrimination and for retaliation. I'd start this morning, I'd go a little bit of a different order than I did in my brief, but I'd like to start with her retaliation claim first. Specifically, Ms. Cosby had alleged claims for retaliation against her former employer on regarding various protected activities she took, one being a 2018 internal complaint she filed with her employer against her two male supervising alleging a hostile work environment and harassment, language she specifically used in that complaint. In regard to that complaint, what's your language in that complaint that says there's discrimination on the basis of sex? Your Honor, I would concede that Ms. Cosby in the complaint beyond noting harassment and hostile work environment did not specifically reference or use the word gender or sex. However, she did testify and there was testimony and other evidence before the district court that in making that complaint and in using the words hostile work environment and harassment against her two male supervisors that she as a female was intending to report conduct that she felt to be in violation. I understand that that's what transpired in the district court, but what did she convey to the employer that would indicate that there was discrimination on the basis of sex? Because obviously you can have a hostile work environment that doesn't have anything to do with sex discrimination. Certainly, Your Honor. And again, Ms. Cosby did acknowledge that she did not use specific language to say it was because of her gender. However, she did reference her two male supervisors in the complaint itself. She as a female and reporting her two male supervisors felt that she was reporting that conduct and I believe under the case law that if the plaintiff in making a complaint to her employer feels that she is conveying conduct that is in violation of Title VII that she is availing herself. Specifically, what case law are you talking about that supports what you're arguing that if she reasonably believed that it was a title complaint? Certainly, Your Honor. I'm citing to Boyer-Liberto where it specifically references if the individual takes activity that they believe to be opposition activity to conduct they believe to be in violation of Title VII that qualifies as protected activity. And again, Ms. Cosby did testify. That's true, but my recollection of the record may be incorrect, but I'm not sure any of that came to pass until after the lawsuit was filed. So I'm not sure how the employer was ever on notice of that. Your Honor, I think that's a very good question and to that point I would note to the employer's own testimony that's part of the record as well. The individual who investigated the complaint that Ms. Cosby raised specifically acknowledged in his testimony that when he received the complaint he perceived it as a Title VII complaint and that the appellee took it. Where is that in the JA? I was going to ask you about that. Let's see. Your Honor, I believe that can be found at JA 654 through 655 and that was testimony from Agent Harmon and he specifically acknowledged that his initial reading of the complaint, including the language that Ms. Cosby used in the complaint, led him to believe it was a complaint being made pursuant to Title VII and that's what they pursued it as. I'm sorry, what did you say, 650? What? Yes, Judge, 654 and 655. Okay, thanks. Well, what he said was, I'm just reading this, we view that her complaint might be a Title VII complaint under the Civil Rights Act. So what else other than that indicates that the employer saw it as a sex discrimination claim? Well, Your Honor, that's what we would rely on. Agent Harmon testified that he viewed it initially as that and that's how they staffed it and they staffed it to his office because they had viewed it as a Title VII complaint. Well, he said it might be a Title VII complaint and I would assume any HR department that gets something that says hostile work environment is going to look at that. But, I mean, is this your best evidence there, what I just read on 654? Well, Your Honor, I believe our best evidence is basically the intention of Ms. Cosby in making the complaint and her testimony about her intention and the language that she used, coupled with the employer's own testimony as well that it viewed it that way. And again, I believe the case law looking at, you know, again, the Netter case, you know, implies that protected activity is to be viewed broadly and expansively. And again, under Boyle-Liberto, looking at the intent of the party, Your Honor, we believe that there is strong evidence that that's exactly what she was reporting. She alleged that this harassment extended to the members of her team and that within that team there were also men. Your Honor, it would, Your Honor, but I would also note that the specific language that she testified to was not that all members of her team were being subjected to the same conduct. I believe she specifically testified that the conduct she was experiencing was impacting her team. And in fact, there was additional testimony from her that she was being treated differently from all of the males on her team. And that specifically regarded, you know, constantly being questioned, constantly being investigated, going around her back, not publicly acknowledging service awards the same way they did as males. So again, I believe there were certainly testimony and evidence to that fact. Trial testimony. I'm particularly interested, though, in what was communicated to the investigation. She was offered the opportunity to expand on the complaint. She still never said there was anything tied to her sex. Is there something in the record I've missed about that? Your Honor, again, in the complaint itself there is nothing in the complaint itself where she indicates sex or gender. But again, her testimony wasn't from trial. Unfortunately, we never got to the trial stage. Her testimony was at a deposition where she did indicate that in making the complaint that was her intent. I would also note, I do think it's important to go back, there is a site in the record. I will find that for Your Honor. In regard to the employer, they also noted in their summary of findings that they staffed it and initially viewed her complaint as a Title VII complaint. And that's also in his testimony on JA-655. That's correct, Your Honor. That it was initially viewed as a civil rights complaint, and that's why it was staffed the way it was. That's correct, Your Honor. That's correct. So, again, we believe her testimony that that was her intent in making that complaint and using the language she did, including the words harassment and hostile work environment against her male supervisors, as well as the employer's initial impression that that's exactly what she was reporting should be sufficient under the broad and protected activity to qualify as such. Going to that particular claim and looking at that in the retaliation realm, again, it is worth noting that the record is very clear that the investigations that ultimately resulted in Ms. Cosby's forced termination began the day after her supervisor, the same supervisor she was reporting for a hostile work environment and for harassment, the day after he was notified of her complaint. And that all the other complained of adverse actions that followed, including her being forced to take a polygraph, her being driven to the polygraph by the two agents, two male supervisor agents she had complained about, and ultimately her forced termination followed those actions that was reported the very day, or excuse me, the investigations that started the very day after her supervisor was advised of her complaint against him. So what do you maintain is the adverse action that supports this retaliation claim? Was it the internal investigation? Your Honor, we have alleged, great question, we have alleged a number of different adverse actions. It would be the initial investigations requiring her to take a polygraph after the initial questioning, ultimately the forced resignation of her employment. Why do you say it's an initial investigation? Because if I'm looking at the timeline correctly, there had been discussions by the Gambrel and maybe others with her about relationships with her subordinates, and they counseled her about it all before she filed the complaint. So this is not the same thing as a case where it starts anew right after a complaint is filed. This was ongoing. Your Honor, that is the position that the employer would take in this case. However, the record and the evidence, or the evidence and the record in this case... I mean, factually, is that incorrect? Your Honor, I would say that there had been investigations prior and that there was evidence in the record saying that the employer had determined there was nothing there and they weren't going to take any action. In fact, the regional director said nothing further is to happen. No further investigation occurred, and Agent Gambrel specifically testified at JA 260 to 265 that he did not make this report and begin this new investigation, which we do contend was new, the day after he was advised of Ms. Cosby's complaint against him. So again, we do believe there was a break between the initial investigation that was taken and that was closed by the regional director and the new investigation that started into these allegations the day after. Wasn't the initial investigation or questioning with regard to a different person? So that's what makes this new? Yes, Your Honor. That's a great question because yes, it was. The initial investigation were for general allegations of her conduct with other staff members and other members of her team. But in regard to this last investigation that ultimately resulted in the forced resignation, that actually was in regard to one specific subordinate in regard to an incident that had happened three years prior that Ms. Cosby testified she had told her previous supervisor about closer in time when it happened. So Judge Thacker, thank you for that question because there had been no allegations specifically or investigation around this specific subordinate in this alleged romantic relationship until the day after Ms. Cosby's supervisor was notified of the complaint against her. So again, we do believe that there was sufficient evidence of The day after her complaint was filed against the supervisor, did that supervisor, Gambrill, did he go to the person that she was allegedly having a relationship with or was it the other way around? Did she complain? Yes, Your Honor. That's a great question. The supervisor, Chad Gambrill, testified in the record that he went to the subordinate and questioned her about it. So he started it. The subordinate wasn't complaining. He started it the very next day. That's correct, Your Honor. There were notations and representations and briefs filed on summary judgment representing that reports had been made to the employer and that's why they investigated. But Agent Gambrill specifically testified that he went to Nicole Albany the very next day and Nicole Albany also testified to the same, that she did not seek out or file a report, that it was Agent Gambrill, the same agent that Ms. Cosby had complained about who came to him the day after he learned of her complaint. So, yes, Your Honor. So again, we do believe that there was, so we don't think there was any mitigating factor and that's important to note going back to the issue of discrimination. There was another male in the same office as Agent Cosby who had also been rumored to have engaged in romantic relationships with a subordinate. The same individual who testified that he led the investigation into Agent Cosby testified that he had the authority to do investigations, but he did no investigation in regard to the male agent, Greg Stewart. Instead, he testified that he went to Greg Stewart and basically told him, if you're doing this, stop it. But otherwise, he wasn't going to investigate. And that was very different action than what occurred in regard to Ms. Cosby, who was, in fact, investigated to the point they went out to find the subordinate. So, we do believe that that is, you know, that's another issue. We do believe that the court improperly and erroneously discarded that comparator evidence of Greg Stewart. They had her take a polygraph exam. Yes, Your Honor. With the other, with the male that was rumored to be having a relationship. That's right, Your Honor. She didn't have to take a polygraph exam. That's right, Your Honor. They just denied and that was good enough. That was good enough for them in regard to the male agent. He did not have to take a polygraph. He was not questioned. And they, Agent Harmon also acknowledged he did not seek out the subordinate in the situation with Agent Stewart to find out if anything had happened. He just took Agent Stewart's word on it. But that was very different, obviously, than what happened in regard to Ms. Cosby, who they went to, questioned. After they questioned her, they then sent her for a polygraph test and went and spoke to the subordinate involved. So, again, we do believe that that evidence goes both in regard to the comparator evidence in regard to Ms. Cosby's discrimination claims as well as her retaliation claims to show not only that she engaged in proximate, or excuse me, in protected activity, but there was a causal relationship between that protected activity and the ultimate forced resignation of her employment. Judge Wynn, I would also note in regard to your question, there was one other additional adverse employment action we alleged, and that was falsely reporting to the Law Enforcement Training Academy that Ms. Cosby had been terminated for misconduct, which she had not. I believe my time is up, so I will sit down and reserve my remaining time. We've got some time for rebuttal. Before we hear from you, Mr. Morgan. All right. Mr. Morgan, we'll be glad to hear from you. May it please the Court, I'm Rick Morgan. On behalf of what we refer to in South Carolina as Triple P, I have with me today Mr. Wade Leach, who worked with me on the brief, and Ms. Octavia Wright, who is the Associate General Counsel at Triple P. Your Honor, with regard to a number of the questions, let me first address that form that Ms. Cosby filled out. In her deposition, I asked her this question. This form you filled out at Triple P, it is a citizen personnel formal complaint form. Is there any language in the specific nature of your allegations that say that this hostile work environment was based on sex or gender? Is there any words in that form specific to the nature of the complaint that states the harassment, the hostile working environment was based on sex or gender? The answer to that question was no. An opposing counsel has conceded that in her argument, and she points us to the Fountain Blue case because an appellant reasonably believed it was a Title VII discrimination complaint. Your Honor, in answer to that question, I think it's, in our view, fairly simple. We have an opportunity in the discovery process to ask of a witness or a party to a piece of litigation what evidence they might have or what facts they have to support the allegations in that particular case. We specifically ask that question of her, and she said, no, that language does not appear. What she then tried to do is, after the fact, with her affidavit, I think if you go to the joint appendix, I think it's 267 and 268, which is her affidavit, which is the Fountain Blue case. We would refer the Court to the longstanding cases in this circuit, beginning with the Barwick case that says that a party may not, may not create a factual issue by submitting an affidavit. Okay, but I'm asking you about the Fountain Blue case, and what's your response to opposing counsel relying on our language there that says that an employee may bring a retaliation claim for a complaint she reasonably believes to be for a Title VII violation? Well, Your Honor, I understand that language. I agree that language appears in the Little Rebettos case. My point is this, that when you ask someone under oath, do they have any evidence at all to support their claim, and they say, no, I do not, then I don't know, to I think Judge Agee's initial questions, how is the employer to know? The employer did know. The employer testified at JA 655 that they initially assessed it as a civil rights complaint, and that's why it was staffed the way it was. Because it also says that that's a dual form, and since it was an employee, Mr. Harmon did consider that. In his investigation, when he had it, he indicated and testified that he did not find it to be one of harassment based upon either sex or gender, and then continued with the investigation that he had been assigned. He investigated it, he says, as a Title VII complaint. Do you agree with that? No, I don't agree with that. He discarded that. Where? I'm looking at JA 655 at the top of the page. If you look at JA 481, 553, and 554, I believe that in the joint appendix, Harmon, who was tasked with investigating that hostile work environment, found that Cosby had not alleged a Title VII civil rights complaint, including protected class activity. Right. That's what they concluded, but they, because they were investigating it as a Title VII complaint, they initially assessed it. I'm talking about his testimony where he says it was initially assessed as a Title VII complaint, and that's why it was staffed the way it was. It went to the director because of that. OPR did have responsibility for investigating both internal and external complaints when that form was filed. Yes, he did initially look at it, and he testified on joint appendix 554 that he would interview the complainant because some people don't use the correct language that might change the nature of the complaint. He looked at it initially. You are correct, Judge Thacker. Okay. That's all we need. They did look at it as a Title VII complaint initially. They concluded there was not a violation. Based upon the language in the investigation. Okay. Yes, Your Honor. Okay. Go ahead. Thank you. Okay. We then look at some of the issues of the comparators, and when we look at that... Looking at the comparators, is that on hostile work environment, sex discrimination, or retaliation, or all of them? I believe that as the complaint was filed, it applied Judge Thacker. Yes. When I look at the comparator issue, again, we go to the deposition testimony, and in her deposition, we ask her the specific question, and there are really two questions that we asked of her. It might be helpful in talking about comparators, if you are using it, which context you are using it. Sex discrimination, hostile work environment, or retaliation, because they are not all going to be the same. Okay. Let me first look... The retaliation, because it seems to have been the governmental argument on the other side. Retaliation. Focus on the retaliation aspect of that. The retaliation, as I understand, and the way we have defended the case, goes to the internal complaint, one, and then the ensuing steps that took place after that. That would be... How does comparator evidence affect retaliation? I don't think that it does, but I do believe that the plaintiff has argued that it does. We just don't see it based upon the facts and the law of the case. Well, if the comparator evidence doesn't affect retaliation, and after the complaint was filed, there was a new investigation in the sense that they went to another person, why wouldn't that be sufficient, at least for summary judgment purposes, to sustain a retaliation claim? Our position is this, and I would point the court to a couple of places in the joint appendix. Albany, who was the individual involved that was spoken to about the treatment that she had, if you look at joint appendix 621, 627, 766, and 777, it's our reading that Ms. Albany had already been contacted before Mr. Gambrell was advised of the internal complaint against him. He did speak with her, without question. He did speak with her the day after he learned about that complaint. He talked with her before? He had set up the meeting, but because of scheduling, they were not able to... Where is that? I believe you'll find that on 621, 627, 766, and 777. Do those one more time. Your Honor, I believe 621, joint appendix, 627, 766, and 777 is the court for that position. No question that Mr. Harmon did review it. We don't dispute the fact that Ms. Cosby did have the polygraph test that she took. Those four pages is your best, so we're... I'm sorry, Your Honor? Which is the best page of those four to say this was already in process with Nicole before October the 18th? Can I take a look at Mr. Leach, and I will get you that information as to what would be the best information on that. Also, do you concede that there wasn't a policy against out-of-office sexual activity at the time? Yes, ma'am. At that time, yes, Your Honor, no question. However... Why was he investigating her in the first place? Triple P had a professionalism policy, and I have pondered this since the day this case came in. And here's where I have landed, and I think you don't have to have a policy about no dating to tell someone they have to be a professional. I had the great privilege to sit as a city judge for a number of years, and we had a code of judicial ethics just like the court has that we had to follow. We have our code of professional responsibility that we have to follow. I'm sorry. So the man that was accused of an improper relationship with a subordinate, when did Mr. Gambrill talk to that subordinate about the man's behavior? It wasn't Mr. Gambrill. It was Mr. Harmon. Did he talk to the subordinate about the man's behavior? He was not accused. It was just rumors. There was no one who had complained about that. Well, who complained? Ms. Albany complained. In 2015? No, when she met with Mr. Gambrill. When he reached out to her? So my question is, when did he reach out to the person that the man was rumored to be having a relationship with? Mr. Gambrill did not reach out to that person. When did anybody reach out to the person that the man was rumored to be having a relationship with? They didn't, right? They did not, because it was a rumor. It was a rumor, not a complaint by a co-employee. The complaint in this case was in 2015. The complaint that was investigated by Mr. Harmon arose when they met in 2018. When Mr. Harmon brought it up. Did Ms. Albany complain and then Mr. Harmon talked to her, or did Mr. Harmon talk to her and then she said, yeah, we had a relationship? Ms. Albany, based upon our view of the record, complained beforehand. When? In 2015 or 2018? 2018. Where do I find that? Maybe your co-counsel can look for that, too. We are looking for that. Thank you. Yes, Your Honor. Thank you for that question. When we then look at, I guess before we move on, I want to make sure that I cover that. All of this happened after the complaint was filed against Gambrill and Honeycutt. The ensuing investigation that led to the polygraph took place after the October complaint. I think that is correct, Judge Agee. Yes, sir. I want to make a couple of other points with regard to the preservation of issues for appeal. We've pointed out in our brief that at the district court level, at least on the discrimination portion of the complaint under Fourth Circuit precedent, there were no specific objections filed by the plaintiff on the report and recommendation that Judge Herlong then went through, and he said there's no specific objections to the core discrimination complaint, but even if, even if, that doesn't preclude it, I do not find that there was discrimination. 765, Your Honor, I think would be the best joint appendix reference. Gambrill considered the matter to be ongoing and discussed with Black that Harmon and Black would meet with Cosby again. However, the meeting was ultimately canceled when Black developed a conflict. That's on 756. 756, and this is from what? No, you said 765, I thought. It's 765. 765. I misspoke, Your Honor. I guess when we get a little bit of age, we forget numbers a little bit. So our position is, then, if you look at the whole of this case, it really falls under a Reeves versus Sanderson standard. The company, Triple P, never, ever, ever changed its position with regard to what happened with Ms. Cosby. There's a professionalism policy that had been in existence for years. She knew about that. I just want to say, this JA 765 doesn't support, I don't think at least, I don't see where it says that he had set up the meeting with Ms. Albany before the internal complaint was filed, but I may be reading that incorrectly. I don't see Albany's name anywhere. Oh, it's over here, maybe. Gambrel considered the matter to be ongoing, discussed with Black, and Black would meet with Cosby again, Cosby again, and that, so that did take place. So, but how does that tell us that Ms. Albany's meeting with her was on the docket before the October 19th complaint? Because the very next page says just what, I mean, it says the complaint was filed in the following day he met with Albany. It may be anything. 766, you know, the following day, met with Albany. I will agree that it's unclear as to who set the meeting up. There is some unclarity there, Judge Thacker, to answer your question. Well, wouldn't that be relevant, though, for summary judgment purposes that there's a potential dispute of fact then about what the stage of the investigation was because if there was proof at trial that this discussion with Albany was in the works before the complaint was filed or before Gambrel became aware of it, that would seem to be a pertinent fact. But at least in our brief review here during argument, I'm not seeing anything definitive that would establish it as an undisputed fact that that was the case. Your Honor, all I can say is this, there was an ongoing investigation beginning back with the concerns on professionalism that Mr. Gambrel and Mr. Honeycutt had had for a period of time with regard to Ms. Cosby. Those issues were ongoing throughout that employer-employee relationship and that Ms. Albany did get involved in that concern that they had over that period of time. Your Honor, what we would... I see my time is about ready to expire. We believe that the district judge met all the required standards and set forth by this court and the Supreme Court of the United States and we would respectfully request that this court affirm the grant of summary judgment. And in my final couple of minutes, I will say, if I might, as a point of personal privilege, I'm always humbled when I have an opportunity to come up here and appear and meet the fine jurist on this court and had an opportunity over many years to do that and I know I'm at the back end of my career and appreciate the opportunity to appear before you today on behalf of Triple P. Thank you very much. All right. Thank you, Mr. Morgan. And Ms. Atkinson, you've got some rebuttal time. Thank you, Your Honor. Just in very brief response to the testimony that this was scheduled before, I'm aware of zero evidence in the record that establishes this meeting was scheduled before. In fact, Nicole Albany's testimony... or excuse me, let me point to Agent Gambrell's testimony found at JA 260-261 where I asked Agent Gambrell, Agent Gambrell, I believe you testified that you went to Nicole Albany on November 8, 2018 and asked her about an alleged relationship with Kristen Cosby. Is that correct? He said, right. And I said, is that not the day after you were advised that Kristen Cosby had filed a complaint against you? And he responded, yes. So again, we know nothing in the record that this was scheduled before. I just wanted to touch on that briefly. I did also want to touch very briefly on this argument that there were no specific objections filed. There were in fact 16 pages of objections filed to the magistrate's R&R. Those are found at JA 726-741 and the district court specifically have noted those objections in its report and opinion and order on those report and recommendations, essentially going through each of those very specific objections and why it disagreed. So we believe that argument is not with any merit today. Finally, I did want, just in my very brief time remaining, just to go back to the discrimination piece and the discrimination claim that we didn't get to address in regard to the comparator evidence. And I believe the questions asked about the comparator evidence, we would say that that would be related to Ms. Cosby's claims for disparate treatment. Specifically, she claimed three different types of disparate treatment in regard to different disciplinary action, in regard to an application for a promotion she made in comparison to male employees, as well as other treatment that she testified that she suffered that was different than all of the other team leads in her office, which included all the constant investigations going around her, questioning her, and not publicly acknowledging her. And as set forth in our brief, we believe that there was sufficient comparator evidence on each of those. We've talked a little bit this morning about Greg Stewart. He was the male agent who was not similarly questioned or disciplined in regard to allegations of a subordinate relationship. And I believe under the applicable case law there, the question should be in assessing different disciplinary action, whether or not they had the same supervisor and whether or not they were alleged to have been involved in the same conduct. And we think that evidence in regard to Greg Stewart couldn't be clearer on that point. Who was the supervisor in common? They both worked in the same office, and so the same agent in charge, Agent Gambrell, would have been the supervisor over both of them. And we know from the testimony we've been talking about, Agent Gambrell brought up this allegation and went to Albany. Is there evidence in the record that establishes that as to Stewart? The only evidence is that they were, that Stewart was in the Greenville office. Yes, I will have to find that site, but it was acknowledged by Harmon that Agent Stewart was a team lead in the Greenville office. In fact, he was actually in a higher position than Ms. Cosby in the same office, as such that you would have thought that the employer, if they really were concerned about professionalism, they would have really thought about that in terms of somebody as a higher supervisor the same way. Right, but who specifically do you say was his superior? Your Honor, we would say that Agent Gambrell was the agent in charge. He was the agent in charge of the Greenville office and Honeycutt was the assistant agent in charge of the Greenville office. So they would have been the supervisors for everyone in the Greenville office, which included Officer Agent Cosby as well as Agent Stewart. All right, now what about timing, though? I mean, is there something in the record that establishes that at the time these events happened with respect to your client that Stewart was there working for them? Your Honor, I believe that was in regard to the testimony from Agent Harmon. I would have to find the exact site, but I believe that Agent Harmon testified and I can point to his testimony about Agent Stewart was at pages 645 through 655 and I would have to look for the exact site where he references the time period, but I don't, honestly, Judge, I don't know that that specific reference is in there, but I believe he did testify to that, that they were both in the Greenville office. What were those pages again? Your Honor, it was 645 to 655. That would seem to be a fairly pertinent fact. They may have both been in the Greenville office, but it seems like to me Gambrell was not always the agent in charge. I think that there was also an additional, Judge, that's a point well made, but I think one other point we would make, Judge, is that Agent Harmon testified that he was the one who staffed all of these kind of complaints and he had discretion in investigating them. So, aside from the direct supervisor, we also have the individual who testified he's charged with staffing these and he said specifically, I looked at Cosby, we did polygraph, but we did not do that for Agent Stewart. Your Honor, I see my time is up, so unless the court has further questions, I would sit down. All right. Thank you very much. We'll come down and recounsel and move on to our next case.
judges: G. Steven Agee, James Andrew Wynn, Stephanie D. Thacker